Jones, Chief Judge,
joins in the foregoing dissenting opinion.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Ozark Dam Constructors is and was at the times hereinafter stated, a joint venture composed of Brown & Boot, Inc., a corporation of the State of Texas; Wunderlich Contracting Company, a corporation of the State of Nebraska; Peter Kiewit Sons Company, a corporation of the State of Nebraska; Winston Bros. Company, a corporation of the State of Minnesota; David G. Gordon, a citizen of the United States and a resident of Colorado; Fred B. Schultz and Chester W. Cunningham, citizens of the United States and residents of Nebraska, co-partners trading under the firm name of Condon-Cunningham Co.; Morrison-Knudsen Company, Inc., a corporation of the State of Delaware; J. C. Maguire and Constance S. Maguire, citizens of the United States, and Constance Smurthwaite Maguire Trust; Marie F. Monahan Trust, Alice L. Maguire Trust, Nell L. Maguire Trust, Constance Patricia Maguire Trust, and Francis D. Maguire Trust, all of California, co-partners trading under the firm name of J. C. Maguire & Company; and Chas. H. Tompkins Co., a corporation of the District of Columbia. All of the plaintiffs are experienced in the field of heavy construction and several of them are among the oldest firms in the United States engaged in this type of work.
2. On May 8, 1947, after due advertisement for bids, defendant, acting through the Corps of Engineers, Department of Army, entered into a contract, No. W-03-050-eng-461, with plaintiffs, in which plaintiffs, in consideration of the payment to them of certain prices therein set forth estimated to total $22,146,440, agreed to furnish all the labor and construction equipment and many of the materials, but not including cement, for use in the construction of a concrete, *134 gravity-type dam and appurtenant works at the Bull Shoals Dam site on the White Elver in Marion and Baxter Counties, Arkansas, in strict accordance with specifications, schedules and drawings which were a part of the contract.
3. Article 1 of the contract, and paragraph SC-1 of the specifications, provided that plaintiffs should start the work within 15 days after receipt of notice to proceed, and that the work should be completed within 1,250 days thereafter. Notice to proceed, dated June 9,1947, was received by plaintiffs on June 11,1947, and the 1,250 calendar days of contract time, therefore, expired on November 12, 1950. The work was not completed until November 1, 1951, which was 354 days beyond the originally scheduled completion date. Plaintiffs were granted various time extensions during the life of the contract, including a unilateral extension of 35 days because of defendant’s failure to supply cement, which was enlarged on appeal to 44 days, as will be hereinafter related. These time extensions were sufficient to extend the contract time beyond the date of actual completion.
4. The construction work under the contract called for the use of a large amount of cement, the estimated quantity according to bid item 18 of the contract being 1,800,000 barrels, all of which was to be supplied by the defendant. The cement required for the concrete to be used in the construction of the dam was to be a blend of approximately 75% Portland cement and 25% natural cement.
5. Paragraph SC-11 of the contract specifications, entitled Government Furnished Material or Equipment, as modified by modification 2 dated May 17,1948, provided:
(a) General. — The Government will furnish to the contractor as free issue the materials and equipment listed below. The materials and equipment shall be incorporated in the finished work by the contractor. Such materials and equipment will be furnished f.o.b. Cotter, Arkansas, and the contractor will be required to accept delivery when made, pay any demurrage incurred, and unload and transport the materials or equipment to the job site at his own expense unless otherwise specified.[1]
*135 * * * The materials and equipment to be furnished by the Government are as follows:
(c) Cement.
(1) General. — The Government will place an order with the mills for the Portland and natural cements which will be available approximately August 1, 1948. The contractor shall furnish to the mills in writing its requirements and shipping dates for Portland cement and shall furnish to the contracting officer in writing at the same time its requirements and shipping dates for natural cement. The contractor shall give at least 30 days’ written notice in advance of the date it will require the first cement of the respective types or kinds and thereafter on the first of each month shall furnish to the above parties, in writing, the amounts required and the shipping dates for the next 30-day period as to each type of cement. Copies of all orders or notices shall be furnished the contracting officer in triplicate. The Government will not he liable for any expense or delay caused the contractor by delayed deliveries except as provided wider Article 9 of the contract. [Italics supplied.]
At the time they submitted their bid, plaintiffs had considered and were familiar with the provisions of paragraph SC-11 (c) (1) of the contract specifications and interpreted the nonliability provision of that paragraph as intended to relieve defendant from liability only for minor delays which might normally occur, but for not more than a day or two in duration. Plaintiffs did not interpret this provision as affording complete immunity to defendant in the event its failure to furnish cement resulted in a complete suspension of operations for a substantial period of time.
6. Paragraph 5-04 of the contract specifications headed section v — CONCRETE work provided:
5-04. Cement.
(a) General. — Bulk cement in carload lots will be furnished by the Government in accordance with the provisions of paragraph SC-11 and shall be used for all major work. For isolated minor items of concrete work in which the volume of concrete is too small to justify the necessary facilities for the handling and storage of bulk cement, as determined by the contracting officer, cement may be furnished in cloth or paper bags. The quantity of bulk cement delivered to the contractor will be determined from certified shipping weights.
*136 7. Paragraph GC-12 of the general conditions of the specifications provided as follows:
GC-12. SUSPENSION op Work. — The contracting officer may order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the contractor, the contracting officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the contractor, provided, however, that the suspension was not due to the fault or negligence of the contractor.
8. The contract contained the following articles which are germane to the instant claim:
Artccle 9. Delays-Damages. — If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in the contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby and for liquidated damages for delay as fixed in the specifications or accompanying papers, or if not so fixed any actual damages occasioned by the delay. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the contractor shall be liable to the Government for any damages resulting from the delay as herein above stated. Provided, That the right of the contractor to proceed shall not be *137 terminated or the contractor charged with liquidated or actual damages because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes. The contracting officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the Head of the Department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
* * * * #
Aeticle 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision shall be final .and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
9. Defendant made arrangements for the procurement of the cement and for its shipment in bulk via the Missouri-Pacific Railroad from the cement mills to the railroad spur at Cotter, Arkansas, where plaintiffs were to accept delivery. These arrangements included two contracts -with the Universal-Atlas Cement Company of Independence, Kansas, dated January 6, 1948, and February 17, 1949, for the purchase of 270,000 and 200,000 barrels, respectively, of Portland cement, delivered at Cotter, Arkansas. These contracts were followed by two more with Universal-Atlas, one dated September 23,1949, for 255,000 barrels and one dated February 23,1950, for 726,000 barrels, both of which called for delivery at Cotter, Arkansas. On March 10, 1949, October 20, 1949, and February 27, 1950, defendant also made three contracts to purchase natural cement from the Louisville Cement Com *138 pany at its mill at Speed, Indiana, for delivery at Cotter, Arkansas, which would involve the use of the Missouri-Pacific Railroad.
10. Defendant’s f.o.b. delivery terminal at Cotter, Arkansas, which is referred to in paragraph SC-11 (a) of the specifications, was served only by the Missouri-Pacific Railroad. Cotter was approximately 16 or 17 miles from the site of the work. From Cotter to the j obsite there was a spur track that had been constructed by defendant prior to the award of the plaintiffs’ contract, the purpose of which was to facilitate the hauling of materials to the site. Plaintiffs, however, provided additional railroad facilities both at Cotter and at the damsite for the delivery and handling of materials, including cement. At Cotter, plaintiffs installed the additional railroad sidings necessary to handle the required cars. At the damsite, plaintiffs also provided similar facilities, as well as a combination highway-railroad bridge across the river necessary to bring the cars to the jobsite. The nearest alternative railhead to the damsite was West Plains, Missouri, on the Frisco Railroad, approximately 70 miles from the dam. The Frisco ran to Cherryvale, Kansas, where it connected with the Santa Fe which ran to Independence, Kansas.
11. On March 8, 1949, defendant by letter advised plaintiffs that under the terms of the “latest contract” for purchase of Portland cement, it was provided that beginning April 1, 1949, all shipments shall “be made as required by the Government, on shipping notices issued to the contractor by the Contracting Officer * * The letter of March 8, 1949, also advised plaintiffs that the foregoing constituted a change in the requirements of the previous cement contract, and that it was called to plaintiffs’ attention so that they might notify defendant’s engineer in charge of their cement requirements sufficiently in advance to permit ordering to be carried out in proper time.
12. The construction plan followed by plaintiffs called for the diversion of the river in two stages. The first stage involved the diversion of the river from a portion of its normal channel and the construction of a cofferdam encompassing the area from which the river had been diverted. Within *139 this cofferdam, or first- diversion area, plaintiffs then constructed the first section of the dam. This phase of the operations was completed in July 1949, and plaintiffs at that time entered the second diversion stage. The river was then allowed to flow through outlet or diversion valves installed in the section of the dam which plaintiffs had already completed in the first diversion area and, by means of a second cofferdam, the flow of water through the first channel was stopped. As soon as this second diversion of the river was accomplished, plaintiffs began foundation excavation work in the area within the second cofferdam and planned to pour the first concrete in the second diversion area on or about September 19, 1949. Schedules prepared by plaintiffs as early as December 21, 1948, had shown concrete for the second diversion area starting in September 1949, and defendant had estimated in July 1949 that plaintiffs would begin concrete operations in the second diversion area about mid-September 1949, or possibly a little earlier.
13. On July 9, 1949, plaintiffs gave written notice to the cement mill that for September 1949 they would need 12,000 barrels of Portland cement, and for October 1949 they would need 41,000 barrels of Portland cement. This notice also advised the mill that deliveries should begin about September 15,1949. As will appear later, the employees of the railroad had voted on July 6, 1949, for a strike to occur on July 11,1949. Plaintiffs and defendant knew that a strike was threatened.
The labor difficulties of the Missouri-Pacific at this time were a matter of public knowledge and the various developments of the impending strike were carried in detail in the newspapers.
14. On August 18, 1949, plaintiffs, in conformity with defendant’s letter of March 8, 1949, previously referred to, again supplied defendant with written information concerning September cement requirements, advising that Portland cement should be scheduled for delivery at the rate of 2,000 barrels on September 19; 2,000 barrels on September 21; 1,000 barrels on September 28; 2,000 barrels on September 26; 2,000 barrels on September 28; and 1,000 barrels on September 30,1949. Plaintiffs requested the delivery of cement *140 on these dates in order to commence concrete placing operations in the second diversion area on September 19,1949, as planned. On August 18, 1949, plaintiffs also advised the engineer in charge by letter that natural cement should be delivered at the rate of 1,000 barrels on September 27 and 1,000 barrels on September 29, 1949. On August 19, 1949, defendant, by two letters of that date, advised the mills of the cement requirements set forth in plaintiffs’ two letters of August 18,1949.
15. Long prior to the time that plaintiffs’ notices of cement requirements were given to defendant, the Missouri-Pacific Railroad was threatened by a strike. On November 3,1948, the employees of the railroad voted to authorize a strike because of 282 grievances. From November 3,1948 until June 1949 unsuccessful negotiations were conducted between the railroad and its employees to settle these grievances. From June 14 to July 7,1949, the National Mediation Board, acting pursuant to the National Railway Labor Act, unsuccessfully attempted to mediate the dispute. During the course of that mediation, the employees on July 6,1949, called a strike to become effective at 2:00 p.m. on July 11, 1949. On July 11, 1949, before the strike commenced, the President of the United States appointed an Emergency Board to investigate and report respecting the strike, and the strike was postponed. The Emergency Board conducted hearings from July 14 through J uly 29,1949, and submitted its report to the President of the United States on August 2,1949. The employees of the railroad rejected the board’s recommendations for the settlement of the controversy, and called for the strike to begin at 2:00 p.m. on September 9, 1949. On September 6, 1949, the Missouri-Pacific, in anticipation of the strike, issued an embargo on tendered freight, effective 12:01 a.m., September 7, 1949. The strike began on September 9, 1949, and all service on the railroad stopped at that time. The strike continued to October 24, 1949.
16. The embargo of September 7, 1949, applied to all points on the Missouri-Pacific Railroad, including Independence, Kansas, where defendant had been procuring cement up to this time, and Cotter, Arkansas, where the cars were switched onto the spur railroad to the Bull Shoals Dam oper *141 ated by plaintiffs. Consequently, no cement deliveries could be made over the Missouri-Pacific from September 7, 1949 until October 24, 1949, when the strike terminated. The first cement delivered after the strike was received at the damsite on October 31,1949.
17. Plaintiffs’ superintendent, M. H. Slocum, met with representatives of defendant on July 6, 1949, and again on September 12,1949, just after the strike started, to discuss its implications and especially the question of its effect upon the cement work. In July plaintiffs had only 6,500 barrels of cement on hand and it was agreed that it would be inadvisable to use it if a regular supply could not be assured. The 6,500 barrels would have lasted only four or five days. The situation was the same in September. Defendant could not advise when the required amount of cement would be delivered. This made it impracticable for plaintiffs to begin pouring concrete on September 19, 1949, as they planned. Defendant did not request that plaintiffs begin operations in the second diversion area with the 6,500 barrels on hand. Both parties understood at the time that this would not be feasible. Further, it would not have been good engineering practice to have stockpiled cement at the dam for a long or indefinite period because of the chemical properties of cement. The specifications prohibited this.
18. After September 25,1949, the plaintiffs’ payroll records show a severe drop in wages and manhours for field labor and crafts and this continued until the strike ended on October 24. For the period from the start of the strike (September 9) to September 25, there was an increase in total wages and manhours worked. As respects specific categories of employees, however, this situation varied. There was an increase in manhours worked by air tool operators until October 2 and a decline thereafter. For the week prior to September 25 there was either an increase or no reduction in manhours worked by boilermakers, penstock welders, crane and shovel operators, structural steel workers, blacksmiths, reinforced steel workers, electricians, powdermen and laborers. After September 18 there was a decline in manhours worked by welders, concrete batch and mix operators, machine repair and maintenance mechanics, machinists and *142 riggers. The manhours worked by carpenters rose until September 18, declined until September 25, rose back to the September 18 level on October 2, and thereafter declined until the strike ended. Manhours worked by truck drivers declined steadily from August 14 and dozer operators from August 28. There was a steady rise for wagon drill operators until September 11 and a decline thereafter. The rise and fall in manhours worked in these various categories were in large part the result of reassignments which plaintiffs effected in an effort to retain as many as possible of their skilled employees after the occurrence of the strike.
19. All work came to a halt by October 14, 1949, due to the absence of cement. As noted above, following the occurrence of the strike, plaintiffs had endeavored to retain on their payroll the supervisory staff and some skilled workers who would be difficult to replace. Some of them were transferred for this reason to other categories of employment. Accordingly, among those classes of employees not dismissed entirely before the strike ended were some air tool operators, powdermen, wagon drill operators, blacksmiths, structural steel workers and pumping crews. Other field workers, however, were entirely eliminated or nearly so by the time the strike ended or by October 14 when the job had to shut down.
The knowledge the men had of the strike and of its potential effect on their employment adversely affected their morale and efficiency. Plaintiffs had no official policy which condoned this morale factor among the men, nor did plaintiffs order any slowdown. The number of workshifts was necessarily reduced, however. On or about September 30, 1949, plaintiffs reduced the shifts to one per day for a five-day week, whereas previously plaintiffs had used three daily shifts on a seven-day-a-week basis.
20. On September 16, 1949, plaintiffs’ project superintendent, M. H. Slocum, wrote the contracting officer, stating that plaintiffs were ready to start placing concrete but could not do so because defendant had not supplied the cement as it was required to do, that the 6,500 barrels on hand would last only two days, and that costs were being incurred because of the delay. He requested a suspension order, effective September IT, 1949, under GC-12 of the specifications *143 because both, an equitable adjustment in the contract price and an extension of time were considered proper under the circumstances. The contracting officer rejected the suggestion for a suspension order on September 26,1949, in a letter quoting paragraph SC-11 (c) (1) of the specifications making defendant liable for delayed deliveries only to the extent provided for under article 9 of the contract providing for an extension of time for the actual delay period but not to an adjustment in the contract price.
21. The contracting officer, Colonel T. A. Lane, who was also the district engineer, visited the jobsite on September 26, 1949, and discussed the effect of the strike with plaintiffs’ superintendent, Slocum. The latter again suggested that issuance of a suspension order under paragraph GC-12 of the specifications would be appropriate but Colonel Lane thought not. Slocum wrote Colonel Lane on October 4 advising that unless the cement was delivered promptly it would be necessary to suspend the work for the convenience of the Government. He suggested that while it was more convenient for defendant to ship cement by railroad there were two alternatives. He suggested that defendant could deliver the cement by truck 225 miles [2] from Independence, Kansas, to the damsite or by rail shipment over the Frisco Kailroad to West Plains, Missouri, and thence by truck 68 miles to the damsite. He insisted that defendant should either do this or follow the procedure prescribed in GC-12 of the specifications. Slocum realized that, in view of the size of the investment required to undertake a bulk-cement haul by truck from Independence, no trucking firm would agree to haul bulk cement merely for the duration of the strike, but would require a contract covering all the cement needed for the project. However', when Slocum inquired of the Universal Atlas Cement Co. in Independence whether they would agree to load trucks with cement at their plants, he asked only whether they would do so during the strike, and did not ask whether they would continue to do so when the strike was over and trains were once again being loaded at the plant. Slocum’s letter of October 4 was answered *144 on October 20 by the district engineer who said that the contract clearly provided that in the case of delays in cement delivery the contractor was entitled to a time extension but nothing else.
22. Mr. Wendell W. Ralphs was the chief of the construction division of the district office of the Corps of Engineers, Little Nock, Arkansas. He was a staff aide to the contracting officer and, as such, was responsible for all coordination, supervision, and administration of the contract made with plaintiffs for construction of this dam. He is a qualified civil engineer with extensive experience in heavy dam construction. Ralphs considered it a part of his duties to follow labor difficulties which might present an obstacle to delivery of materials necessary for the construction of the dam. He was acquainted with the newspaper accounts of the labor dispute on the Missouri-Pacific Railroad dating from November 1948 and with the unsuccessful efforts to settle it. When on July 6, 1949, the railroad employees called a strike for July 11, he became concerned and continued to follow the situation as reported in the newspapers. He knew it was defendant’s responsibility to supply the cement. He made some preliminary computations of the number of vehicles that might be needed to haul the cement in the event the railroad were shut down, but he concluded that it would have been almost impossible to get the needed vehicles in time to avoid a delay after the strike started. It was at first inconceivable to Ralphs that a strike would come to pass, as there had been none on this railroad for over 75 years. When the strike did happen he, of course, did not know how long it would last, but he was of the opinion it would not be permitted to last long because of the adverse effect it would have on the economy of the area served by the railroad. It was only if there were a cataclysmic condition where the strike would last for months or years that he thought consideration should be given to some other means of getting cement to the job. He thought only rail transportation was practical for this project.
23. The fall of 1949 was a period of general labor unrest in industry and strikes were threatened on various railroads. Ralphe’s opinion on the possibilities of an end to the strike *145 on the Missouri-Pacific changed from day to day depending on the reports in the press. He admitted that on this basis it could have been a year before he was convinced that a positive need might be demonstrated for delivery of the cement by alternative methods. In Ealphe’s opinion, such a need had to be demonstrated before he could, under Government procedures, take positive action in providing alternative delivery methods.
On September 20,1949, eleven days after this strike started, Ealphe called a representative of the Universal-Atlas cement mill at Independence on the telephone to ascertain whether the mill had facilities to load cement into trucks. He was advised that it could be done only for the duration of the strike, after which rail shipments would have to be resumed. During the strike the mill did provide truck-loading facilities for a truck operation sufficient to accommodate small cement buyers such as lumber yards.
24. The Universal-Atlas Cement Company also had a plant at Hannibal, Missouri, a fact called to Ealphe’s attention by the Independence mill, but which he knew already. The Hannibal plant could have delivered cement to West Plains via another railroad. He was of the impression it could not supply a sufficient quantity of cement but made no inquiry to establish this. The Hannibal mill had a productive capacity similar to the one at Independence and produced both bulk cement and packaged cement.
The raw materials required in the manufacture of cement were plentiful in the area surrounding the Bull Shoals dam-site and there were 19 cement plants within a radius of 300 miles and 50 within a radius of 500 miles of the project. There is no evidence in the record as to whether they could have supplied the requirements of the project. No invitations for bids or requests for proposals for truck hauling of cement to the damsite or for hauling over other railroads as far as West Plains were issued by defendant.
25. Although the contract placed the responsibility for delivery of cement upon defendant, Mr. Eoss White, a representative of the plaintiffs employed by the largest of the co-venturers, Brown & Eoot, on his own initiative had made a few inquiries as to the possibility of hauling the cement *146 by truck. He had seen on the highways the petroleum transports of Robert P. York of Houston, Texas, and was convinced he must be an experienced operator in mass transportation of bulk commodities. He did not know Mr. York or know whether he had any cement-hauling trucks or had hauled cement. Upon inquiry by White, however, York expressed willingness to investigate the possibilities of a bulk haul of cement for the project. York had been in the trucking business since 1938, and in 1949 was primarily engaged in the trucking of petroleum and petroleum products. At this time he had never hauled bulk cement, but he did so in 1950, at which time he was the only such carrier in Texas. He had a fleet of about 50 petroleum tank trucks and some dump trucks. In order to haul the bulk cement, York would have used mainly equipment which he would lease or purchase, rather than the equipment he already had. York thought he would be able to obtain sufficient additional equipment to haul the bulk cement.
26. At the invitation of White, Mr. Ralphe met York and White in the lobby of the Grady-Manning Hotel in Little Rock on October 7, 1949. Ralphe was accompanied by the acting district engineer. The meeting was brief but White and York told Ralphe that they believed a truck haul was feasible and equipment available. Ralphe was then of the opinion that trucking from Independence to the damsite would be feasible if time permitted and sufficient equipment was available. Ralphe did not indicate if he had previously been giving any consideration to a truck haul, nor did he advise White and York of his conversation with the mill referred to in finding 23. There was no discussion at this meeting of hauling cement in bags. Mr. WTiite did, however, make the suggestion that trucking of cement be handled by a modification to the contract, since plaintiffs were in a position to handle it more expeditiously than defendant through normal channels of contracting, involving advertising, etc. Ralphe was very receptive to that suggestion but did nothing about it.
27. At the October 7 meeting in the hotel lobby, York stated that he would investigate the problem further by inspection of the damsite, the proposed truck routes, and the *147 loading facilities at the cement mill. He promised to report his findings to plaintiffs and submit a price to haul the cement in bulk by truck to the dam. There is an, issue as to whether Ealphe also asked York to report to him. York does not remember that he agreed to do so and he did not so report, although testifying he would have been glad to do so as he was anxious to get the job. Ealphe considered plaintiffs’ efforts in this matter a kind offer and a favor, and there is nothing in the record to suggest that defendant considered plaintiffs’ efforts to help out in the situation relieved defendant of its admitted responsibility to supply the cement. On the contrary, Mr. Ealphe, as a result of the conference, decided to take a fresh look himself at the possibility of a truck haul and, on October 11, requested the procurement section of the Corps of Engineers at Little Eock to check on whether it would be possible to muster the equipment which would be needed for the haul contemplated by York. This effort of the defendant will be discussed later.
28. Plaintiffs furnished York with a car and driver and he drove over the routes from the damsite to "West Plains and to Independence. York did not at any time submit a price on a haul from West Plains, as he testified it was more feasible to haul the bulk cement needed from Independence. At the cement mill in Independence, York observed the emergency truck-loading of cement then in progress. He discussed with representatives of the cement mill his desire to haul the cement needed for the dam and was advised that the mill wanted the business and could load his trucks at that time. At the trial, York did not recall whether he had specifically inquired of the cement mill management whether it would be willing to load trucks after the strike was over. He said that, since he went away satisfied that he could do the work and that the mill wanted to load his trucks, and since he was interested not in hauling just for the duration of the strike but in hauling all of the rest of the cement needed for the dam, he must have been assured that he would have no trouble getting trucks loaded when the strike ended. Otherwise, he stated, he would not have bid on the job.
29. York estimated 50 dump trucks of 15- to 20-yard capacity would be sufficient to haul all of the bulk cement *148 needed to finish the dam. He considered, also, converting tank trucks for the job, making the necessary alterations in such trucks. He intended to buy or lease the equipment needed and determined it to be in adequate supply. Such equipment would have supplemented what he already owned, some of which might have been diverted to this project.
30. Mr. York concluded from his investigation that delivery of bulk cement by truck from Independence to the site of the dam was more feasible than by bulk or bag from West Plains and advised plaintiffs orally that his price therefor would be $0.28 per hundred pounds. York testified that he was not certain just when he submitted the figure but said he thought it was within three or four days after the October 7 conference at the Grady-Manning Hotel. The evidence indicates, however, that York did not submit the figure until after the strike ended on October 24. He did not submit it to White personally but gave it to someone at Brown & Boot to pass along to White. White did not receive it until October 29. York never did get a contract to do this hauling, nor was his bid to do so ever submitted, either by him or by plaintiffs, to defendant.
31. On October 12,1949, Boss White wrote to the district engineer at Little Bock as follows:
You undoubtedly have been advised that due to the non-delivery of cement, we were compelled to start closing down our operations and laying off personnel September 19 and we will be completely shut down by October 14.
With further reference to the possibility of obtaining cement by truck haul as discussed with your engineers at the dam and with Colonel Bhode and Mr. Balphe in Little Bock, we have sent ,a representative to the cement mill in Independence, Kansas, and find that the mil] is already delivering bulk cement to trucks. It, therefore, seems that there will be no difficulty at that point. Study also seems to indicate that it will be more economical to haul cement from the mill by truck rather than to ship by rail to West Plains and then have the expense of a transfer and a truck haul from that point to the dam.
*149 We have had an experienced transport hauler go over the whole situation and he sees no difficulty whatever in delivering cement by truck.
Both the Government and ourselves are incurring large costs in overhead and other expenses while the project is closed down. We respectfully request that we be given a decision in the matter of furnishing cement.
32. Subsequent to the October 7 meeting, Balphe contacted the Louisville Cement Company at its mill in Speed, Indiana, from which defendant was procuring natural cement. He was advised that this plant could ship the natural cement by truck or rail but would have to load trucks at night.
33. It was on October 11,1949, when Ealphe requested his procurement people to commence the investigation, referred to in finding 27, to determine availability of equipment for hauling bulk cement to the damsite from both Independence and West Plains. There was no investigation made as to the possibility of hauling cement in bags. After finding no information in the procurement section files pertaining to trucking firms having expressed an interest in hauling bulk cement, inquiry was made of several local truck and trailer sales agencies in an effort to locate truckers who would do so. This effort was not productive of helpful information. The defendant then contacted the Fruehauf and Graham Trailer Companies without success. Except for Graham, these contacts were all with sales agencies. Graham was a manufacturer of bulk cement-hauling trailers. Other than Mr. York, neither plaintiffs nor defendant identified any heavy duty or petroleum carriers contacted as a result of inquiry based on the classified pages of the telephone directory.
34. On October 12, 1949, defendant communicated with the Four-Wheel Drive Auto Company. A representative of this company on October 14 advised defendant in Little Eock that he knew of two large-scale trucking concerns with cement-hauling equipment that might be interested, and he would contact their representatives in Houston, Texas. No information was received from this source, however, and no further attempt was made by defendant to follow the lead prior to the end of the strike.
On October 20, defendant answered plaintiffs’ letter of October 12, quoted in finding 31, and advised that efforts to *150 get proposals for truck delivery of cement had been unsuccessful. The defendant said that, since plaintiffs represented they had someone who would do it, they were invited to submit his name and address and a proposal.
By October 18 it was known that the strike was about to be settled. Plaintiffs did not receive defendant’s letter until October 21 or 22, when it was known that the strike was about to be settled. Plaintiffs did not reply to the letter.
35. On October 24, 1949, the day the strike ended, plaintiffs, by a letter to the engineer in charge, requested delivery of 30,000 barrels of cement for the period October 30 to November 30, 1949. Defendant in turn addressed a letter on October 26, 1949, to Universal-Atlas Cement Company, its supplier, requesting that 30,000 barrels of cement be delivered to plaintiffs and detailing the quantities and shipping dates for the period October 28 through November 28, 1949. The first cement delivered after the strike arrived via the Missouri-Pacific Railroad at Cotter, Arkansas, on October 31,1949.
36. At the time the strike ended on October 24, plaintiffs’ superintendent, Harvey Slocum, was on the West Coast. It was his evidence that operations were on a status quo basis, awaiting his arrival back on the job. Pie did arrive in the late afternoon of October 27 and made an outline for starting operations. However, it is a fact that on October 26, in addition to employees at work on the trestle erection and foundation excavation, there were about 40 men back on the job. Had plaintiffs been assured by October 20 of sufficient cement to continue uninterrupted operations, concrete work could have been resumed October 25. Defendant did not ask plaintiffs to commence operation with the 6,500 barrels on hand. As it was, the first concrete poured after the strike ended was on November 1,1949, the day after the first cement delivery was made. Slocum’s absence did not delay the remobilization. Although plaintiffs experienced increased costs as a result of labor inefficiencies during remobilization, the re-mobilization and commencement of work after the end of the strike were handled with dispatch.
37. Plaintiffs claim that they were subjected to 43 days of delay as a result of defendant’s failure to deliver the *151 cement. This period of delay is computed as extending from September 19,1949, when concrete operations were scheduled to start in the second diversion area to November 1,1949, by which time plaintiffs had sufficiently reorganized their operations after the strike to begin pouring concrete. Defendant’s proof would seek to reduce the period of delay upon the ground that plaintiffs would not have been ready to begin pouring on September 19 had there been no strike and were not, in fact, ready until September 26, 1949. Defendant says plaintiffs were delayed 31 days from September 26 to October 27, 1949, by reason of the strike. In order for concrete operations to begin, two conditions were necessary. Preparation of the foundation rock must have reached a stage where concrete could be poured on it and the erection of the trestle from which concrete would be poured must have reached a stage where it would have been practical to use it. Defendant contends that neither of these conditions had been met before September 26,1949. These conditions will now be considered.
38. The concrete operations in the second diversion area included the pouring of 17 monoliths, ranging from 48 to 54 feet in width and approximately 300 feet long, the latter dimension paralleling the streambed. These monoliths were numbered so that number 17 was immediately next to the concrete poured during the first diversion of the river, with the remaining monoliths numbered in descending order through monolith number 1 at the edge of the river.
39. In order to prepare the foundation rock for the placing of concrete on it, plaintiffs first had to remove the rough excavation down to a distance of one to three feet above the final foundation elevation. The rock had a characteristic that caused it to decompose rapidly when exposed to the weather for as little as three or four days, so the final scaling and sand blasting of the rock to the required final elevation was not done until shortly before the time when concrete was to be placed. This final work did not necessarily require blasting with explosives. Although plaintiffs began the rough excavation in the second diversion area as soon as the diversion of the river was completed, no attempt was made, for the reason indicated above, to complete the final clean-up during the period when the strike prevented *152 delivery of cement. This was a reasonable procedure and eliminated the possibility of duplicating the clean-up operation.
40. The length of time required to complete the clean-up excavation for a single monolith varied from one to three days, depending on the amount of rock to be removed. By August 5,1949, plaintiffs had completed the rough excavation for monoliths 17, 16 and 15. Had the strike not occurred, plaintiffs could and would have been able by September 19,1949 to complete the clean-up excavation for these monoliths and to erect the necessary forms for placement of concrete therein.
41. Concrete for the monoliths in the second diversion area was poured from a steel trestle approximately 1,900 feet long which was built across the river simultaneously with the pouring. Plaintiffs mixed the concrete at a batching plant and placed the same in buckets transported from the plant by special concrete-carrying cars pulled by a small diesel locomotive riding on steel rails on top of the trestle. The concrete was then lowered into place by a crane positioned on the tracks. The trestle was built of a series of spans and towers or “bents,” ranging from 170 to 190 feet in height and each resting on separate concrete footings. The trestle footings were located within the foundation area of the dam itself, and, as a consequence, the footings and a portion of the trestle legs were subsequently embedded in the dam as a permanent part of that structure. The bents supported girder spans up to 80 feet in length.
42. There were two types of cranes on the trestle. One crane was of the cantilever or hammerhead type, the chief function of which was to pour concrete. It stands at right angles to the trestle, has a rigid boom, and cannot, therefore, move ahead of the second crane, known as a revolver or whirley-type. The latter has a boom which could be rotated 360 degrees and reach out 125 feet. Its primary function was to pick up the trestle steel and assemble it into position, erecting the trestle ahead of the pouring of concrete by the hammerhead. It would be possible to use the whirley crane to place concrete, the cement cars being able to run underneath the hammerhead. Such use of the whirley, how *153 ever, would have been practical only at night in order not to slow down the daytime construction of the trestle. It is customary to place concrete on a three-shift basis, and plaintiffs frequently poured concrete at night during the construction of the dam. Under normal construction procedure, erection of trestle and pouring of concrete would have been performed concurrently. The whirley had to work about 40 feet ahead of the hammerhead.
43. Normal construction practice is also to pour the monoliths alternately or in staggered fashion. The monoliths had to be surrounded with forms to hold the concrete. These forms cannot be stripped away until the concrete has dried and set and has proceeded in height some 10 or 15 feet above the adjacent monolith. This requires an interval of three days between the lower pours or lifts, two and one-half feet high, and five-day intervals between the subsequent five-foot lifts. Thus, in order that the pouring of concrete and the existence of the forms not interfere with an adjacent monolith, a contractor would normally pour a lift in the odd-numbered monoliths for as far out as work had progressed before pouring even-numbered monoliths, or vice versa. The more bents that had been constructed, therefore, the more monolith areas the hammerhead crane would have in which to move back and forth pouring concrete. With the pours of the odd-numbered monoliths higher than those of the even-numbered ones, or vice versa, the forms would not conflict with the pours or lifts under this procedure.
44. The first trestle bent in the second diversion was located in monolith 17 and was completed during the first diversion on or about January 1, 1949. The additional trestle bents were later constructed in the locations for monoliths 15, 13, 11, 9, and 7. Since, as heretofore noted, the rough excavation for monoliths 17, 16 and 15 had been completed by August 5,1949, and since the whirley crane had a 125-foot boom capable of pouring concrete two monoliths beyond where it stood on the trestle, plaintiffs contended that had cement been available, they could have poured soon after August 5 in monoliths 17,16 and 15. This assumes that the whirley crane would have been used at night for this purpose and that a practical means could have been devised *154 for pouring adjacent monoliths. If the bedrock foundations for the monoliths varied sufficiently in elevation, it is possible that this would have permitted simultaneous work on adjacent monoliths. The evidence does not establish that ibis was the fact, or that plaintiffs had planned to proceed in this manner, or at anytime did so on this project.
45» On September 19, 1949, plaintiffs had completed the trestle through monolith 15, which by using both cranes, would have made it possible to pour concrete soon thereafter in monoliths 17, 16, 15, 14 and 13. On September 23 the trestle was moved onto the bent in monolith 13 and by September 27 it was moved onto the bent in monolith area 11. Defendant contends that it is more practical and efficient to have three bents in place before pouring because an extension of the trestle to this extent makes it possible to pour in three monoliths, staggered as described above, and thus avoiding any interference in placement. Thus, defendant says, September 26 or September 27 would have been the earliest and most practical date to begin pouring cement. This, however, discounts completely the availability of the whirley crane to place concrete. It is reasonable to conclude that, since staggered pours or lifts are normal practice, this is the plan plaintiffs would have followed had cement been available on schedule, although there was no requirement that concrete be placed in alternate monoliths, other than the practical aspects of it as described above. Plaintiffs, however, could have poured a lift in monolith 17 on September 19, 1949. Concrete could have been placed in number 15 on September 20. On September 21, the first lift could have been poured in number 13. On September 22 the second lift could have been poured in number 17 and on the 23d the second pour could have been made in number 15. On September 24 the second pour could have been made in number 13 and on September 25 the third pour in number 17. On September 26 the third pour could have been made in number 15. Thereafter, the placement of concrete could have continued without interruption.
46. Trestle erection normally proceeded at the rate of one bent every four to seven days, so, assuming excavation permitted it, at this rate plaintiffs could have erected at least six bents between August 5 and September 19, 1949. This was *155 not done, however. Apparently, no effort was made to complete the trestle by September 19 when plaintiffs planned to start pouring concrete in the second diversion area. However, as stated in finding 42, trestle erection and concrete placement are normally performed concurrently. As shown in finding 18, plaintiffs on September 18, 1949 began to lay off employees who did trestle work. This was on account of the strike and lack of cement. It has been previously found, however, that the knowledge the employees had of the strike adversely affected their efficiency. The elapsed time between erection of the bent in monolith area 17 and that in area 15 was from January 1, 1949 to September 19, 1949. To what extent this hiatus was attributable to employee morale or to time required to complete work in the first diversion area, cannot be ascertained from the evidence. The strike was still in progress when the bent in monolith area 13 was made ready on September 23, 1949, four days after number 15. Number 11 was ready on September 27, four days after number 13. Number 9 was ready on October 12, fifteen days after number 11. Number 7 was ready October 17, five days after number 9.
47. Had defendant furnished cement on schedule and had there been no strike, it is found that plaintiffs could have started to pour cement on September 19, 1949, as planned, and the status of the excavation and trestle work would not have interfered therewith. Thus, plaintiffs’ delay in performance was 43 days.
48. In order to haul the cement by truck from Independence, Kansas, or West Plains, Missouri, to the damsite, a trucker, not one of the parties to this suit, using his own equipment, would have been required to obtain a certificate as a common carrier, or a permit as a contract carrier, from the Interstate Commerce Commission. Such certificates and permits define the territory in which a trucker may lawfully operate and the commodities he is authorized to haul. In 1949 there were no truckers in Arkansas, Missouri, Kansas, Iowa, or Nebraska who were authorized by the Interstate Commerce Commission to operate between these points to carry bulk cement. It was the policy of the Commission to grant certificates or permits when a demonstrated need for *156 a service existed. The railroad strike, causing failure of cement deliveries, was such a need.
49. Procedure existed for issuance within 24 hours of an emergency authority to operate, on application over the telephone, and such authority would be good for 30 days. Application also could be made for a 180-day temporary authority or for permission to operate for the duration of the strike and for a permanent authority to operate over the route involved. A 180-day authority took two or three weeks to process, but could be applied for at the same time as the 30-day authority. Permanent authority would be granted only on proof of public convenience and necessity after a hearing in which interested carriers would be allowed opportunity to intervene and protest. This procedure might take as long as six months. Temporary authority would be extended, however, until the application for permanent authority was ruled upon. While the application for permanent authority might have been protested, the existence of rail transportation would not in itself be sufficient grounds for refusing to grant the authority. If permanent authority was denied, the carrier would have to cease operations after the termination of the strike or the 180 days, if the authority granted therefor was not contingent on the end of the strike, or upon the termination of such extensions of the temporary authority as the Commission might grant prior to decision on the application for permanent authority. The evidence establishes that sufficient grounds existed for a qualified trucker to get authority to operate for 30 or 180 days, or for the duration of the strike, but he could not be assured of a permanent authority prior to exhausting the procedure of application therefor as outlined above.[3] Permanent authority would have been required to complete the hauling by truck of all of the cement needed for completion of the dam. The last cement was poured in March 1951, approximately 17 months after the strike ended.
50. The second phase of dam construction required 1,124,000 barrels of cement, 75 percent Portland and 25 percent natural, over a period of about 18 months. At the beginning and end of this period the requirements were estimated *157 to be about 2,000 barrels per day. During peak production of approximately three months, 4,000 to 5,000 barrels per day would be required.
51. Over long distances, bulk cement is hauled in closed cement transport carriers. For short hauls it is possible to transport cement in any type of vehicle, but for the long distances involved in this case, 280 miles from Independence, Kansas, and 525 miles from Speed, Indiana, it would not have been practicable to haul large quantities of bulk cement in dump or grain trucks protected only by a tarpaulin; the standard cement carriers or tank-type trucks converted to such use would have been required. Bulk cement must be kept from the weather. The cost of new cement transport carriers in 1949 would have been from $12,000 to $20,000 per unit. Assuming the use of new or converted 20-ton tank trucks, each of which could carry 100 barrels of bulk cement, and assuming no difficulty at the mill in loading trucks during or after the strike, a minimum of 52 would have been required to keep the job going with cement hauled from Independence, Kansas, 280 miles away. To haul the additional cement from Speed, Indiana, 525 miles distant, would require additional trucks. It is found that 60 such trucks would have been required during peak production to haul the bulk cement needed from Independence and Speed and to complete the job within the time required. For the reasons noted in the finding above, this full number would not have been required at all periods of the haul. The trucks could not have made more than one daily trip to or from Independence and one trip every two days from Speed, Indiana. They could have made more trips from West Plains, Missouri. Not over 20 or 25 trucks of 100-barrel capacity would have been needed at maximum production for this latter haul.
52. Cement in bulk or bag could have been delivered to West Plains by railroads not on strike. The haul from that point, however, Avould have been practical, if at all, only in bags. For that purpose, flatbeds, vans, or any other ordinary single-axle truck would have been able to carry the bags without special preparations other than tarpaulin covers. The capacity of such trucks, however, is less than that of the *158 20-ton, 100-barrel tank trucks referred to previously. To haul cement in bags from Independence, four bags equaling one barrel, would require perhaps as much as one-third more such trucks than to haul the cement in bulk. For hauling cement in bags from West Plains to the damsite, nine tractors and at least 20 trailers would have been needed, working around the clock, to deliver from 4,000 to 4,800 barrels daily. As in the case of bulk cement, however, the exact number of vehicles required would depend on the rate at which the cement was used at any given time.
53. As previously noted, Mr. York’s testimony was to the effect that it would have been practicable to have hauled in bulk by truck all of the cement that remained undelivered at the time of the strike. In 1933-1935, Mr. Eoss White, representative of one of the co-venturers, had experience in using trucks to haul over a million barrels of cement for construction of the Norris Dam in Tennessee. The haul was over a distance of only approximately 14 miles and over a period of 24 to 30 months. Slocum, plaintiffs’ superintendent, had experience in other sections of the country in hauling cement by truck prior to 1949 in amounts not exceeding 100,000 cubic yards. Defendant had constructed a dam at Nimrod, Arkansas, in 1939 (through the same district office of the Corps of Engineers that administered the contract involved in the present suit) where more than 80,000 barrels of bulk cement had been delivered by truck over a seven-mile route over a period of one and one-half years. Brown & Eoot, one of the co-venturers here, was the contractor.
54. Availability of trucks for the haul to Bull Shoals Dam would have directly affected the practicality of such a haul. There is no evidence of any truck haul in the area of the magnitude required here, either in distance or quantity. All such hauls had been by rail. There were no known bulk-cement truck haulers in business in the area. As previously noted, Mr. York testified that he thought that the equipment could be obtained. There was the possibility that petroleum tank trucks could be leased or purchased and converted for the hauling of bulk cement. This would have required cutting doorways at the top and rear of the tanks and the installation of a rainproof door at the top and a rear unloading gate. *159 The plaintiff’s witness White described this process as “butchering up” a petroleum hauler. So far as appears in the record, such a conversion had never been made. Reconversion of the tanks would have required removal of the doors and the welding of plates over the openings.
55. As with bulk cement, availability of trucks for the haul of a sustained, steady supply of cement in bags would have determined whether or not it was possible or practicable. Trucks suitable for hauling cement in bags were not sought by either party, nor inquiries made about them at the time in issue, nor was this possibility seriously discussed, if at all, between the parties. Plaintiffs had not suggested bag cement to York. Defendant’s representatives testified that they knew of no one in the area who had a fleet of trucks adequate or available to do the job and that the difficulty of mobilizing a fleet of trucks for hauling packaged cement would have been as great as that of mobilizing a fleet of trucks to carry cement in bulk. In 1949 the only motor carriers authorized to carry a commodity like cement in packages or bags to the damsite were two small carriers, W. L. Plarp and Mountain Home Truck Line, which would have had to get additional authority from the Interstate Commerce Commission or work out arrangements with connecting carriers. Neither of these carriers had sufficient equipment available to supply even plaintiffs’ September and October cement requirements. Brown & Root owned or could have leased a fleet of 30 or 40 flatbed and pole trailer trucks of a type suitable for hauling cement in bags. There is no evidence that defendant knew this or that their availability was offered to defendant. Plaintiffs’ representative, White, did not recommend that defendant haul bag cement because to do so would have increased the cost of the cement and labor.
56. To haul the needed cement by truck, in bulk or bag, a trucker would have had to assemble a fleet sufficient to service the remaining requirements of the dam. York testified that he would not have been interested in hauling a small load in bags unless there were a possibility it would lead to substantial future business. It is found that a small or indefinite quantity haul would not only have greatly increased the price but would have been inadequate to sustain *160 cement requirements at the dam. Double-axle equipment, if necessary, would liave cost $12,000 per unit. There is no evidence of a haul of bag cement comparable to what would have been required here. Plaintiffs’ representative, Ross White, agreed that it would not be profitable nor in accord with common sense to haul a small amount of bag cement. He had urged upon defendant the hauling of bulk cement as the most economical and sensible plan, and agreed that there would have had to have been assurance of a haul of a “substantial portion of the remaining cement” and not just a haul lasting a few weeks or a month. Since no one knew how long the strike would last and a trucker would not incur the considerable obligations to mobilize a fleet of trucks, not knowing how much he would be able to haul, he would have had to receive assurances that he could haul the known quantity of cement needed to complete the second diversion.
57. The truck route from Independence to the damsite could have been on paved or blacktop roads most of the way as far as Gainesville, Missouri. Two alternate routes were available to Gainesville. From there south to the damsite the route would have been over Route 5, eleven miles of which were in Missouri. There were several other routes, not passing through Gainesville, to the damsite. These routes would not have involved use of Route 5.
From West Plains, Missouri, to the jobsite via the shortest route was a distance of approximately 70 miles, 56 of which were in Missouri. The shortest and best route would have been on Route 160, previously Route 80, to Gainesville, thence south on Route 5. The jobsite could also have been approached from West Plains by a much longer route, north on Routes 63 and 60 to Mansfield, thence south on Route 5, through Ava to Gainesville. The road between Ava and Gainesville, which was about the same distance as from West Plains to Gainesville, was of the same construction as Route 160 from West Plains to Gainesville and of Route 5 south from Gainesville to the Arkansas border. The route from West Plains through Mansfield and as far as Ava was over paved or blacktop roads. This alternate route was approximately 75 miles longer than the direct route first described above from West Plains to Gainesville and the jobsite. *161 Plaintiffs have proposed a third route through Arkansas. The evidence establishes that this would not have been a feasible route for the hauling of either bulk or packaged cement at the time here in issue.
58. The road from West Plains to Gainesville and south toward the damsite had long been an ordinary gravel road. It was regraded between 1946 and 1948 and given a two-inch aggregate base and an “armor coat,” which is one shot of oil as a primer and another as a seal, and then covered with chips of pea gravel rolled into the second shot of oil. This was a low-type traffic road with a dustless surface designed for passenger car and light traffic by trucks of a ton and a half and two tons and only an occasional heavy truck. Continued heavy loads in good weather would damage this road. Winter or wet weather causes such a road to deteriorate more rapidly if subjected to heavy loads. The State of Missouri gives authority to the highway department to post weight limits. The district highway engineer in charge of this road at the time here in issue testified that 20-ton trucks carrying between 75 and 100 barrels of cement at a rate of between 2,000 and 5,000 barrels per day would have badly damaged this road within 60 to 90 days under favorable weather conditions. He would have posted the road for limits of over four or five tons. He was certain that if the fall had been wet and a truck haul in the winter of 1949 continued into the spring of 1950 he would have had to limit it to loads of two and one-half tons. State law permitted a maximum weight limit of 18,000 pounds to the axle and a gross weight of 56,000 pounds.
59. The condition of a road is not in direct proportion to the amount of usage it gets but usage has a bearing on it. The use of alternate routes, a variation in the number of trucks used, and the weather would all have had a bearing on what happened to the road. It was the highway engineer’s opinion that the road would not hold up over 60 to 90 days under the use by 25 to 50 two and one-half-ton trucks daily in normal weather. A trucker would not be permitted to use the road if it was going to cause damage so that it would not be suitable for use of the public, even if he promised to repair it when he got through with his hauls. If a trucker agreed to put up a bond of $2,500 per mile for approximately 60 *162 miles of this road likely to be damaged by his heavy traffic, a sum estimated to be necessary to assure its repair, and if he could agree to maintain it while using it so that the public would not be inconvenienced, he might be permitted to proceed with the type of loads necessary to haul the cement here under discussion. Only 11 miles of this road would have been used on a haul from Independence to the damsite. If there were a wet season during the spring or fall, the road might have been posted even if the contractor had put up a bond to maintain it; there could be no assurance that the road would be available to heavy trucks over an extended period. There is no evidence about limitations by Arkansas, if any, on the use of its roads. There is no evidence as to whether in 1949 the defendant gave consideration to the condition of the highways over which a truck haul would be required or whether the problem of their use was ever put to the highway department before trial of this case.
60. As noted in findings 23 and 28, there was a question as to whether the cement mill at Independence would load trucks after the strike. The mill was designed to load railroad cars and its servicing of trucks appears to have been limited to the duration of the strike. The mill had no permanent facilities to load trucks. It was the opinion of the assistant plant manager, who testified, that after the strike when the mill was again running at full blast and servicing rail cars, it could not have also efficiently serviced trucks with the existing facilities. He considered that a separate structure would have been required with separate bins, loading platforms, pipes, pumps, compressors and a new scale and that preparation of such a structure would take six months. In order to load bag cement, however, the scale would not have been necessary. The cost of these additional facilities is not established but the evidence shows no persuasive reason why they could not have been provided if needed and agreeable to the mill although, admittedly, the mill had previously favored the railroads. There is no evidence that this policy was immutable.
61. In 1949 the loading facilities at the cement mill in Independence consisted of a series of overhead conveyors which brought the cement from the storage to the loading *163 areas where it was discharged directly into the railroad cars below. Five cars could be loaded simultaneously with bulk or packaged cement. It would have been possible to load trucks during the strike by covering the rails with gravel or timbers at a nominal cost. The mill did not load trucks in this way, however, but loaded them on the scale and delivered the cement to sidings where it was loaded onto cars of the Santa Fe Eailroad with the aid of a hopper screw-conveyor, a fairly simple operation. The Missouri-Pacific Eailroad owned the spur that went into the mill. During the strike the mill loaded onto trucks approximately 60,000 barrels by the method described and as high as 6,400 barrels per day. The cost to the mill of converting to this type of operation did not exceed $10,000 and it took about a week. The mill also loaded bag cement onto flatbed and dump trucks during the strike.
62. Although it was the expressed intention of the cement mill at Independence not to load trucks after the strike, it would have been possible to do so without serious interference with its need to load railroad cars for other customers. The productive capacity of the mill was 6,000 barrels per day while plaintiffs’ daily cement requirements varied between 2,000 and 5,000 barrels per day. Had the mill wished to do so, it could have modified its tracks with gravel or timber, as mentioned above, and assigned some of the five tracks for exclusive use in meeting plaintiffs’ requirements. This would have required a separate scale for the trucks and perhaps another loading platform. Modification of the single scale for alternate use thereof by trucks and rail cars would have been cumbersome and time-consuming. A 30-ton truck scale would have cost $3,180 in 1949. While the access road from the mill to the highway was not good, it had proved sufiicient during the strike for the use of the type of trucks needed to haul cement to the dam. Defendant accepted the mill’s advice that after the strike it would not load trucks, without going into a discussion of any of the possibilities outlined above or attempting to get the mill to change its policy against trucks. Similarly, plaintiffs’ superintendent Slocum, when inquiring about the loading of trucks, did not even ask whether the mill would load trucks after the strike was over. (See finding 21).
*164 63. Plaintiffs offered evidence that feasibility of truck hauling of bulk cement from Independence to the damsite was not dependent on the willingness or unwillingness of the mill to load trucks after the strike. Plaintiffs suggest that the cement could be loaded at the mill on cars of a railroad not on strike, in the usual way, and taken to Independence three and one-half miles away where they could be shunted to a siding or “team track” where the cement could be transferred to trucks for the haul to the damsite. A team track is a siding paralleled by a driveway suitable for teams of horses pulling drays, or for trucks, to which railroad cars may be switched for purposes of loading or unloading. As previously noted, during the strike the mill at Independence had used a siding to load bulk cement from trucks loaded at the mill to cars of another railroad, and this siding was of sufficient length to enable the mill to load 16 cars, or 6,400 barrels of cement per day. Additional siding, if found needed, could have been constructed for approximately five to seven dollars per foot.
64. Plaintiffs’ evidence has, also, advanced various methods to transfer the cement from the railroad cars to the trucks. These included a conventional mobile car unloading device, designed, however, for mobile or temporary use and smaller amounts of cement than here considered. This device was usually employed in highway construction. It would have cost about $4,000 in 1949. It would, however, load 250 barrels per hour and could have loaded 5,000 barrels in 20 hours of continuous operation. Another method of transferring the cement would have been by providing a pit or hopper beneath the team track into which the hopper cars would dump the cement. A belt or bucket elevator could then have loaded the cement from the pit into the trucks. The installation of this pit-loading method would have required approximately one week and an expenditure of $3,000. This system would have been somewhat similar to that used by the mill during the strike for the reverse operation then employed and referred to previously.
65. There is a conflict in the evidence as to whether a silo would have been necessary at the siding in Independence. Such a silo would have been useful in keeping the cement *165 from wet weather. It could have been erected in a week to ten days, simultaneously with the other work, and would not have delayed the cement delivery. If the trucks were loaded at the cement mill for a direct run to the damsite, completion of transfer facilities at the siding in Independence would not have been required prior to the end of the strike. Such facilities would have included additional siding as might be found necessary, a silo and improvement of the access road. Such work would not have taken over two weeks. Such preparations would have required an expenditure in the neighborhood of $25,000.
66. Plaintiffs admit that their suggestion as described in the above findings was “one of those things you only do as a last resort.” Plaintiffs did not recommend it or feel it was required. York had not himself loaded trucks from hopper cars but had seen it done and regarded it as practical. Defendant says it could be justified only if there was no possibility of ever delivering the cement in any other way, and then only after long and careful preparation. Defendant contends that construction of an all-weather road might have involved condemnation proceedings which would take months. No such procedure is shown by the evidence to have been required for actual promulgation of this plan. Defendant admits it would have been more likely to lease property than condemn it. Defendant also takes the position that plaintiffs’ scheme could not have been put in operation in less time than the delay which actually occurred by reason of the strike. Plaintiffs say that no delay would have been occasioned if defendant had put the burden of cement delivery on plaintiffs by a change in the contract as first suggested by plaintiffs on October 7, 1949. Defendant, while receptive to the suggestion, did nothing about it as previously noted in finding 26. Any action that might have been taken pursuant to the plaintiffs’ October 7 suggestion would have been useless because it was known by October 18 that the strike was about to end.
67. Adaptation of plaintiffs’ own plant at the damsite for the acceptance of cement by truck would have required only minor revisions which could have been made in little time and at small cost. What facilities would have been required *166 at West Plains for transfer of cement from railroad, cars to trucks is not satisfactorily established. Shipment by train to West Plains of bulk cement for its transfer to trucks would not have been feasible.
68. The cost to defendant of bulk cement delivered by rail over the Missouri-Pacific Railroad from Independence and Speed to Cotter, Arkansas, would have been approximately $3.27 per barrel, consisting of the purchase price of cement at the mill of $2.22 per barrel, plus $1.05 per barrel representing the rail freight from the mill to Cotter. In order to get the cement hauled from Cotter to the damsite, defendant would have had to pay plaintiffs an additional $0.11 per barrel under bid item 18. This makes the total cost of delivery of cement from Independence to the damsite $3.38 per barrel. For the remaining 1,124,000 barrels the total cost would have been $3,799,120. Mr. York was willing to truck haul the bulk cement from Independence to the damsite for $0.28 per hundred pounds, or $1.05 per barrel. Including the cost of the cement at $2.22 the total cost would be $3.27 per barrel, the same as rail cost from Independence and Speed to Cotter. Under a contract with York, the $0.11 per barrel cost to haul the cement from Cotter to the dam, as required when the railroad was used, would have been saved. This would have resulted in a saving to defendant in the approximate amount of $123,640 over the cost of delivery of the same quantity of cement by rail, assuming all of the cement could be supplied by Independence, as York gave no figures on the cost of a haul from Speed and did not visit there.
The defendant says that the cost of a truck haul over a train haul would have been $700,745. Defendant has omitted from its computations the cost of moving the cement from Cotter to the damsite, has assumed, among other things, the added cost of transferring cement at Independence from railroad cars to trucks because of unwillingness of the mill to load cement into trucks after the strike ended, has used a higher estimated per ton-mile truck rate than York estimated, has included estimated costs for a right-of-way, spur track, road and silo at Independence, and has assumed a sustained movement at 5,000 barrels daily. Considering only those elements heretofore found to be reasonable and sup *167 ported by the evidence, but otherwise accepting factors and costs defendant has asserted, it is found that the cost of truck haul over rail haul could not have exceeded approximately $100,000. On balance, it is found that the evidence supports the conclusion that the cost factor in truck hire for the haul of 1,124,000 barrels of cement would not have been any hindrance to its use had defendant found tins method feasible and elected to employ it.
69. Because no one knew how long the strike would last it could not have been anticipated what quantity of cement would have been required in the period of delay claimed by plaintiffs. For this and other reasons previously considered a bulk haul of a quantity substantially less than the needs to complete the entire second diversion, although possible, would not have been practicable.
70. Defendant asserts that it could not have saved any of the time lost by the strike by substituting truck for rail transportation of all of the cement needed to complete the dam. Preceding findings have touched on each element relied on by defendant in this regard or as an insurmountable obstacle to the feasibility of a truck haul, such as the large amount of cement needed, the length of the haul, necessity for an assured supply, the number of vehicles required, necessity for a long-term contract for the complete cement requirements, lack of trucks, inexperience of truckers in the area in hauling cement, necessity of an ICC authority, the condition of the roads, the need to advertise for bids and assembling of equipment and facilities, the cement mill policy against trucks and the time required for defendant’s local representatives to get approval from higher authority.
The strike started on September 9, and plaintiffs’ suggestion, not made until October 4, that it be given the responsibility for delivering the cement, would not have avoided any of the delay occasioned by the strike.
The fact is that neither party was willing to consider seriously the idea of having the more than one million barrels of cement which remained trucked to the damsite except as a possible last resort if the strike should continue for an intolerable period. The reasons were the difficulties recited above, and in addition, and principally, the fact that such a *168 process of delivering cement would have been highly inconvenient and unsatisfactory, in comparison with the through railroad delivery which had been in effect, and would again be in operation as soon as the strike was ended. The plaintiffs did not suggest delivery by truck until October 7, and having suggested it, they abandoned the idea.
71. This case is presented not only on the basis of breach of contract but, also, on the alternative basis that after the strike occurred defendant should have suspended the work under paragraph GC-12 of the specifications, upon the ground that the nondelivery of cement unreasonably delayed the progress of the work, that such delay was for the convenience of defendant, and that the delay was not due to the fault or negligence of plaintiffs. It has been noted in findings 20 and 21 how plaintiffs in September 1949 requested a suspension until such time as defendant could furnish the cement and for an equitable adjustment in the contract price and an extension of time. On October 21,1949, plaintiffs also forwarded to the Secretary of the Army a timely-written appeal from the contracting officer’s refusal of September 26, 1949, to issue a suspension order and to make an equitable adjustment. In the alternative, it was requested that defendant compensate the contractor for damages suffered as a result of the breach of contract by the Government’s failure to deliver the required cement. The Secretary replied on November 2 that the matter was being referred to the chief of engineers as final appellate authority under article 15 of the contract for investigation into the factual matters.
72. On January 16, 1950, the acting district engineer forwarded to plaintiffs his findings of fact on plaintiffs’ appeal from the refusal to issue a suspension order. In support of the contracting officer’s decision, these findings held (1) that the contract had made provision only for a time extension, (2) that the delay was without defendant’s fault or negligence, and (3) that contractors with suitable truck-hauling equipment in sufficient quantities to transport bulk cement to the jobsite were not available during the period of the strike.
73. Hearings were conducted by the Corps of Engineers Claims and Appeals Board on June 28, 1951. Witnesses appearing were not sworn. The board recommended dis-allowance of plaintiffs’ claim on March 11, 1952, holding *169 that under paragraph SC-11 (c) (1) of the specifications defendant was exempted from liability for delay in effecting delivery of cement and that plaintiffs were only entitled to a time extension. The chief of engineers approved the recommendation of the board on March 17, 1952.
74. The companion case of Flippin Materials Company (Eng. C & A Board decision No. 203) involved the same strike and the same plaintiffs, who, in that case, were operating as another joint venture under a contract with defendant to supply the aggregate to be used in the concrete for Bull Shoals Dam. The Corps of Engineers Claims and Appeals Board held that the delay in the Flippin case due to defendant’s failure to supply the plaintiffs in the present case with cement, which in turn had caused the Flippin contractors to shut down their operations, constituted a suspension of work for the convenience of the Government. Unlike the contract for the construction of the dam, however, the aggregate contract contained no provision attempting to exempt defendant from liability for delays and, accordingly, the board determined that plaintiffs in the Flippin case were entitled to compensation for the additional expenses which they incurred as a result of the delay brought on by the strike.
75. On November 17, 1949, the district engineer in the instant case forwarded to plaintiffs a proposed change order, modification 18, dated November 9, 1949, which would have granted plaintiffs an extension of only 35 days to the performance time of their contract for the period during which defendant failed to furnish cement, and requested that the same be signed by plaintiffs if the extension was satisfactory.
76. On November 21,1949, plaintiffs returned the proposed change order for correction, asserting that the period of delay resulting from the nondelivery of cement had been 45 days rather than 35 days. In reply the acting district engineer advised plaintiffs on January 31,1950, that it was his decision that the project had been delayed 35 calendar days as a result of the belated delivery of cement, and informed plaintiffs that they might appeal from such decision within 30 days, enclosing a copy of his findings of fact in support of the proposed change order which plaintiffs had returned for correction. Accordingly, on February 28, 1950, plaintiffs *170 appealed to the chief of engineers in accordance with article 15 of the contract.
77. At the hearing before the Corps of Engineers Claims and Appeals Board on June 28, 1951, plaintiffs introduced proof in support of their position that an extension of 45 days should be allowed for the period of delay. Although, as previously noted, the board denied plaintiffs’ claim for relief under the suspension-of-work clause, it held they were entitled to an extension of time covering the approximate period September 18, 1949, to such date as deliveries of cement were resumed after the termination of the railroad strike. As previously related, October 31, 1949, marked the first delivery of cement following the termination of the strike, which would justify the conclusion that the board believed that plaintiffs were delayed 44 days by the failure to have cement.
78. The plaintiffs were damaged in a substantial amount by their failure to receive cement during the period here involved. In view of the fact that the court holds that the plaintiffs are not entitled to recover, it is unnecessary for the court to determine the exact amount of those damages.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petition is therefore dismissed.

 Bid item 18 of the contract allowed plaintiffs a unit price of $0.33 per barrel for the unloading at Cotter, hauling to and storing at the damsite 1,800,000 barrels of cement.

 Actual distance was 280 miles from Independence to the damsite by highway.

 49 U.S.C. 310(a) defines temporary authority.